**LEWIS BRISBOIS BISGAARD & SMITH LLP**
GARY K. BRUCKER, JR., Cal. SB# 238644
    E-Mail: Gary.Brucker@lewisbrisbois.com
CARSON P. BAUCHER, Cal. SB# 298884
    E-Mail: Carson.Baucher@lewisbrisbois.com
701 B Street, Suite 1900
San Diego, California 92101
Telephone: 619.233.1006
Facsimile: 619.233.8627

Attorneys for Defendant

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 18-cr-0895-RGK |
| Plaintiff, | |
| v. | **VIELKA MCFARLANE'S SENTENCING MEMORANDUM** |
| VIELKA MCFARLANE, | Date:        May 13, 2019 |
| Defendant. | Time:        10:00 am |
| | Courtroom:  850 |
| | Judge:  Hon. R. Gary Klausner |

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................. 1

II.     THE INDIVIDUAL BEFORE THE COURT ........................................ 3

    A.      The Turmoil Of Ms. McFarlane's Childhood Home ............................. 3

    B.      Ms. McFarlane's Love Of Education And Relocation To The United States .................................................................. 4

    C.      Ms. McFarlane Reflects On The Importance Of Her Education ........... 6

    D.      The Realization That Ms. McFarlane's Son Had Cognitive Impairments Forces Her To Rethink Traditional Education ................. 8

    E.      Standard Public School Were Just Not Doing Enough ....................... 9

    F.      Ms. McFarlane Creates The Celerity Schools ................................ 10

    G.      From Celerity Schools To The Celerity Network ............................. 11

    H.      The Offense ................................................................. 12

    I.      Ms. McFarlane's Acceptance Of Responsibility ............................. 14

    J.      Ms. McFarlane's Volunteer Work With Orion ............................... 15

III.    THE COURT SHOULD IMPOSE NO MORE THAN A TWO-MONTH CUSTODIAL SENTENCE, WITH NINE MONTHS OF HOME DETENTION ........................................................ 16

    A.      Ms. McFarlane's History And Character Call For No More Than A Two-Month Custodial Sentence (18 U.S.C. § 3553(a)(1)) .............. 16

    B.      A Significant Custodial Sentence Is Unnecessary To Reflect The Seriousness Of The Offense, Promote Respect For The Law, And Provide Just Punishment For The Offense (§ 3553(a)(2)) ........... 17

    C.      A Two-Month Custodial Sentence Would Not Create An Unwarranted Sentencing Disparity (§ 3553(a)(6)) ............................. 20

    D.      A Custodial Sentence Of More Than Two Months Is Unnecessary To Afford Adequate Deterrence To Criminal Conduct Or Protect The Public (§ 3553(a)(2)) .................................... 21

IV.     NON-CUSTODIAL SENTENCING RECOMMENDATIONS ................... 21

    A.      Restitution ................................................................. 21

    B.      Supervised Release ........................................................ 21

    C.      Self-Surrender Date........................................................ 22

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

D.    Fine.......................................................................................22

E.    Bureau of Prisons Designation...........................................22

V.    CONCLUSION .......................................................................22

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

# <u>TABLE OF AUTHORITIES</u>

<u>Statutory Authorities</u>

18 U.S.C. § 3553(a) ................................................................................. 16, 17

18 U.S.C. § 3553(a)(1) ................................................................................. 16

<u>Additional Authorities</u>

Instituto de Estadística y Censo de la Contraloría General de la República
   Contraloria (Panamanian Institute of Statistics and Census), "Lugares
   Poblados de la República: 2010", *available at*
   https://www.contraloria.gob.pa/inec/Publicaciones/Publicaciones.aspx
   ?ID_SUBCATEGORIA=59&ID_PUBLICACION=355 ................................. 4

LA School Report, available at http://laschoolreport.com/why-did-the-feds-
   raid-celerity-charter-and-whats-next/ (Jan. 26, 2017).................................... 10

La Tierra, "Datos de Corregimiento Calidonia", *available at*
   https://tierra.tutiempo.net/panama/corregimiento-calidonia-
   pm002450.html................................................................................................. 3

United States Census Bureau, "Quick Facts", *available at*
   https://www.census.gov/quickfacts/fact/table/US/SEX255217 ....................... 4

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4838-4405-8517.3
iii
MS. MCFARLANE'S SENTENCING MEMORANDUM

I.      **INTRODUCTION**

*Education is the most powerful weapon which you can use to change the world.*

        — Nelson Mandela

*Education is . . . a great equalizer of conditions of men—the balance wheel of the social machinery.*

        — Horace Mann

*He who opens a school door, closes a prison.*

        — Victor Hugo

*Education is not the filling of a pail, but the lighting of a fire.*

        — W.B. Yeats

If there is anyone who understands the wisdom behind these words, it is Vielka McFarlane. For her, education has not simply been a means to an end or a job to pay the bills. To the contrary, every success and joy that Ms. McFarlane has known in life is the result of education.

Ms. McFarlane was born into abject poverty in a small coastal town in Panama. Thanks to the sacrifices of her mother and her own tireless work ethic, Ms. McFarlane overcame autism, relocated to the United States, worked her way through college and graduate school, and eventually founded a network of charter schools (the "Celerity Schools") in some of the most impoverished and frankly dangerous neighborhoods in Los Angeles. Through the Celerity Schools, Ms. McFarlane did not just give back in an abstract or undefinable way. Thanks to her efforts, literally *thousands* of disadvantaged children, who come from neighborhoods like the one she grew up in, have received a first-class education that has given them the tools necessary to escape poverty and succeed.

Charter schools are privately run, publicly funded, and have come under immense scrutiny as of late for many reasons. In some instances, the problem is

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4838-4405-8517.3

MS. MCFARLANE'S SENTENCING MEMORANDUM

1  poor academics.  In others, like in this case, it is financial irresponsibility.  But there
2  is no denying that the Celerity model was a resounding success where it mattered
3  most and because of that, charter school authorizers throughout the country reached
4  out to Ms. McFarlane, asking her to expand and open new Celerity Schools.

5  With the blessing of the Celerity Education Group ("CEG") Board and with
6  the approval and advice of counsel, CEG founded a parent company known as
7  Celerity Global Development ("Global").  Global's purpose was to manage the
8  Celerity Schools, further the educational goals of the Celerity model, engage in
9  related educational endeavors that the schools could not do for themselves, and
10  expand into areas of the country in desperate need of quality education.  The
11  Celerity Network grew rapidly, expanding from a handful of schools in the greater
12  Los Angeles area to nearly twenty schools across four states.  While this period of
13  rapid expansion allowed underserved children from all over the country to receive a
14  top-notch, free education, the organization failed to respect its role as a shepherd of
15  public funds to be held in public trust.  Ms. McFarlane takes full responsibility.

16  This case involves the misuse of approximately $3.3 million in public funds,
17  of which all but $225,138.15 was repaid.  As will be made clear, however, $3.23
18  million (98%) of the misused public funds were directly related to the expansion and
19  growth of the Celerity Network.  The remaining $67,000 was the result of improper
20  personal expenditures by Ms. McFarlane over a period of five years—expenditures
21  that, in the circumstances of a private for profit enterprise would likely be treated as
22  unreported income and penalized civilly.  But the Celerity Network, comprised of
23  numerous non-profit entities, were the custodians of public funds.  Ms. McFarlane
24  should have known better.  She erred.  And she has paid dearly for her mistakes.

25  Ms. McFarlane no longer has any role with any Celerity School.  Global is an
26  empty shell.  Her reputation is in tatters.  Yet, she still has the desire and ability to
27  do good.  In 2013, Ms. McFarlane founded Orion International Academy ("Orion").
28  Orion is a small private high school that was designed to provide the top performing

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   Celerity students a bridge between middle school and college.  Orion enrolled
2   Celerity students at no cost and has a 100% college admission record.  Since losing
3   the Celerity Schools and Global, Ms. McFarlane has devoted the vast majority of
4   her time to keeping Orion open.  In her role as an unpaid volunteer at Orion, she
5   teaches classes and is responsible for the school's academics.  Without her, Orion
6   would likely fail and its 35 gifted and promising students could be forced to return
7   to the public schools that failed them.

8        Ms. McFarlane finds herself before the Court after a long and complicated
9   journey.  It is with this background in mind that she asks the Court to fashion a
10  sentence that fits the offense, and to impose a custodial sentence of two months
11  (during the Orion summer break), to be followed by supervised release that includes
12  nine months of home confinement (during the Orion 2019-2020 school year), and
13  1,000 hours of community service (to be served at Orion or a similar school).  The
14  requested sentence not only takes into account Ms. McFarlane's harrowing
15  background and the nature of her offense, but will also permit her to continue her
16  vital volunteer work as an educator in underserved communities.

17  II.   **THE INDIVIDUAL BEFORE THE COURT**

18       A.    **The Turmoil Of Ms. McFarlane's Childhood Home**

19       Ms. McFarlane was born in 1962 in Calidonia, Panama, *see* Presentence
20  Investigation Report ("PSR"), ¶ 90, an impoverished town of under 20,000 people.[1]
21  During the last census, the average monthly household income in Calidonia was
22  only around $800.[2]  By comparison, the median monthly household income in the
23  United States between 2013 and 2017 was $4,804—more than six times greater.[3]

24  _____

25  [1] La Tierra, "Datos de Corregimiento Calidonia", *available at*
26  https://tierra.tutiempo.net/panama/corregimiento-calidonia-pm002450.html.
    [2] Instituto de Estadística y Censo de la Contraloría General de la República
27  Contraloria (Panamanian Institute of Statistics and Census), "Lugares Poblados de la
    República: 2010", *available at*
28  (footnote continued)

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

Ms. McFarlane's father was a mechanic; her mother was a home maker.  PSR ¶ 92.  Ms. McFarlane, her parents, and her two siblings lived in a modest, dirt-floor home built by her parents' own hands.  *See id.*  It was comprised of three rooms—a kitchen, a bathroom, and a multipurpose living-cum-bedroom where the family all slept in the same bed.  To supplement her father's meager income, the family partially subsisted on vegetables and fruits that they grew in their own garden.  *Id.*

The first six years of Ms. McFarlane's life were characterized by acute moments of violence.  Her father was an alcoholic, and when he came home drunk, which was often, he would beat Ms. McFarlane's mother mercilessly, sending everyone in the household into a panicked frenzy.  *Id.* ¶ 93.  When Ms. McFarlane turned six years old, her father left the home, leaving her mother, who had nothing more than a fourth grade education to raise three children.  *Id.* ¶¶ 91, 93.

**B.**      **Ms. McFarlane's Love Of Education And Relocation To The United States**



Whatever turmoil was going on at home—be it violence or the destabilizing forces of poverty—Ms. McFarlane's one escape was education.  Though she was diagnosed with autism at an early age, PSR ¶ 94, which made concentration and socialization particularly challenging, Ms. McFarlane's natural intelligence allowed her excel in the classroom.  As a young child, she taught herself how to read using the set of encyclopedias that her parents invested in before she was born.  By age five, Ms. McFarlane had become a

https://www.contraloria.gob.pa/inec/Publicaciones/Publicaciones.aspx?ID_SUBCATEGORIA=59&ID_PUBLICACION=355&ID_IDIOMA=1&ID_CATEGORIA=13
[3] United States Census Bureau, "Quick Facts", *available at* https://www.census.gov/quickfacts/fact/table/US/SEX255217.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   voracious reader.  She would take the bus by herself to the local library so that she
2   could read any book she could get her hands on, including books in German, which
3   is one of many languages that she has taught herself.  *See* Letter of Winnie Tan,
4   Exhibit B to Declaration of Gary K. Brucker, Jr. ("Brucker Dec.").

5          Thanks to the sacrifices of her parents and extended family, Ms. McFarlane
6   was able to enroll in a private school, where she was given resources to learn that
7   would not be available to her in the local public school.  PSR ¶ 94.  But unlike her
8   private-school peers, whose sole focus was school, after Ms. McFarlane's long
9   hours of study and homework, she would join her mother and siblings at food stands
10  outside the bars in Calidonia, selling snacks to tipsy patrons as they stumbled home.
11  *Id.*  For her family, tuition came first; over necessities like food and clothing.

12         Ms. McFarlane graduated at the top of her class in high school, and to the
13  sheer joy and pride of her entire family, enrolled in a local university.  *Id.* ¶ 95.  At
14  the young age of 20, however, Ms. McFarlane's parents mortgaged their home to
15  purchase a plane ticket to send her to the United States to earn money for the family.
16  Ms. McFarlane went willingly, eager to experience the United States, a place she
17  had only read about in books or seen in movies.  *Id.*

18         In 1982, Ms. McFarlane moved to Los Angeles.  But unlike the depictions of
19  L.A. in motion pictures, Ms. McFarlane's life was anything but glamourous.  She
20  moved to South Los Angeles, PSR ¶ 95, which, at the time, was overrun with crime
21  and gang violence.  She herself was robbed at gun point on multiple occasions.
22  Ms. McFarlane spoke little English, but managed to find full-time work in a factory,
23  earning just over minimum wage.  She knew no excess in those days.  Any extra
24  money she earned went directly to her mother and younger siblings in Panama.  *Id.*

25         In the evenings after her long shifts in the factory, Ms. McFarlane, who had
26  never lost sight of her passion for learning, took night classes at a local community
27  college so that she could master English at the level needed to enroll in a four-year
28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  university. She literally walked miles from her job and her small rented bedroom to
2  a local community college to attend classes.

3      In 1989, after seven years of constant work at her job, followed by study into
4  the long hours of twilight, Ms. McFarlane was finally able to enroll at California
5  State University, Los Angeles, where in only a few years she received a bachelor's
6  degree in social and behavioral science. PSR ¶ 110.

7          C.      **Ms. McFarlane Reflects On The Importance Of Her Education**

8      After Ms. McFarlane completed her undergraduate education, like many
9  young people graduating from school, she struggled to decide what to do next.

10     Looking back on her journey up to that point, Ms. McFarlane recognized that
11 her success was not simply a result of her own self-motivation and talents. Her
12 thirst for knowledge would have not gotten her much had it not been fostered by an
13 early education that gave her access to classroom resources and knowledgeable
14 teachers. She came to understand that education allowed her to upgrade from the
15 tattered clothing of her youth, to function in the world despite her autism, and to
16 overcome the instability of her childhood home. Education nurtured her intellect
17 and curiosity, eventually allowing her to enter a much larger world full of
18 opportunities she didn't even know existed.

19     While grateful that the stars lined up for her just so, Ms. McFarlane
20 recognized the grave injustice of this system. She questioned why any talented child
21 would need to rely on luck to find opportunities for growth and success. In this
22 introspection, Ms. McFarlane heard her call to arms. She made the conscious
23 decision to improve the education system, so that little boys and girls who come
24 from poverty and face systemic oppression can still find pathways to success.

25     In 1995, invigorated by this newfound sense of clarity, Ms. McFarlane
26 enrolled at National University in San Diego, where she earned a master's degree in
27 educational administration. PSR ¶ 111. She became a teacher, finding comfort

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4838-4405-8517.3
6
MS. MCFARLANE'S SENTENCING MEMORANDUM

standing before a classroom full of seven year olds and encouraging them to find ways to succeed.

 

As explained by fellow educator Sharon Lee Taylor, Ms. McFarlane dedicated herself to understanding her students and the homes that they come from. *See* Letter of Sharon Lee Taylor, Ex. E to Brucker Dec.  Drawing on her own childhood in poverty, Ms. McFarlane learned to connect with students, parents, and community leaders of the Latino, African American, and Cambodian neighborhoods in Los Angeles so that she could help her students achieve in school despite lacking the support and stability that kids from more resourced families enjoy.  *See id.*

Elizabeth Lands, a parent of four former students, explains how Ms. McFarlane's compassion for her students and their families extended well beyond the classroom walls.  When Ms. Lands found herself pregnant, unemployed, and in the throes of a romantic relationship characterized by domestic violence, Ms. McFarlane took Ms. Lands under her wing.  *See* Letter of Elizabeth Lands, Ex. C to Brucker Dec.  As a result of Ms. McFarlane's guidance, Ms. Lands was able to get off welfare, graduate from college, and go on to get a master's degree in public administration.  *See id.*

Thanks to Ms. McFarlane's dedication to her students, she quickly climbed the ranks in the LA Unified School District, moving from teacher to administrator at the school-level, and finally to administrative roles in the district's head office.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

D.     **The Realization That Ms. McFarlane's Son Had Cognitive Impairments Forces Her To Rethink Traditional Education**



In 1996, while Ms. McFarlane was climbing the ranks at LA Unified and pursuing her master's degree, she received a call from her sister, who was a nurse in Panama.  During a home visit, Ms. McFarlane's sister encountered a baby boy, Rolando, living in absolute "squalor."  PSR ¶¶ 99-100.  His mother was addicted to crack cocaine and, because she used sex work as a means to finance her addiction, she contracted AIDS.  Due to his mother's drug use while pregnant, Rolando suffered from a prenatal narcotics addiction complicated by a congenital infection that left him with significant cognitive and motor delays.  *Id.*  Rolando's mother abandoned him in the hospital.  Rolando's only other adult relative was his great aunt.  However, because she was already burdened with the care of Rolando's five-year-old sister and her mother with advanced dementia, she was incapable of properly caring for Rolando too, given that his medical conditions would require life-time care.



At her sister's request, Ms. McFarlane immediately flew down to Panama and petitioned for custody over Rolando.  From that point on, Ms. McFarlane raised Rolando as a single mother and officially adopted him in 2003.  It was not easy.

Rolando didn't walk until he was two years old.  *See* Letter of Rolando McFarlane, Ex. G to Brucker Dec.  And he couldn't say anything more than a few words until he was four.  She found little to no support for Rolando in the public

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

education system.  Administrators at Rolando's school labelled him as "retarded" and refused to enroll him in regular education classes, demanding instead that he go immediately to special education courses.  For the seven extended years of Rolando's elementary school education, Ms. McFarlane constantly fought for Rolando to get the resources he needed.  She insisted that he receive speech therapy. She insisted that he be mainstreamed into general education courses.  She insisted that teachers and administrators not give up on him as a lost cause.  Ms. McFarlane, who worked with Rolando every evening to help him improve his communication and motor skills, saw just how broken the public school system was, particularly for someone like Rolando who had so much potential, but who just needed teachers with the time that traditional public schools cannot afford them.

### E.     <u>Standard Public School Were Just Not Doing Enough</u>

At the same time that Ms. McFarlane worked full time as a teacher and administrator in the Los Angeles public school system, raised her cognitively delayed son, and fought with his school to ensure that he was not neglected, Ms. McFarlane also pursued a doctorate degree in organizational leadership at Pepperdine University.  PSR ¶ 112.



With the perspective she gained from her classes on how efficient and creative organizations run, she began to see how the traditional model of public education had inherent flaws.  Thanks to slow-moving bureaucracy and systems that tied up funds at the district-level, she observed how students—particularly those with special needs or from low income neighborhoods—do not receive the resources they need and how educators who enter the work force with enthusiasm and commitment to the cause become worn down by excessive administrative oversight and district-level red tape.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

Ms. McFarlane came to understand that the traditional public school model may not be the best way to educate all children, particularly those with cognitive difficulties like her son or who come from under-resourced communities like she did.  Ms. McFarlane learned through her coursework that structuring education systems differently can result in students who are better prepared to handle challenges in the real world.  It was then when Ms. McFarlane realized the possibilities offered by charter schools.  Untethered by many of the restrictions imposed by the traditional model of education, charter schools represented a possibility of trying something new and innovative.

### F.  Ms. McFarlane Creates The Celerity Schools

It was seeing this potential that led Ms. McFarlane to create the Celerity Schools.  Over approximately 10 years, Ms. McFarlane and her team established some 20 charter schools, at first in Los Angeles, but soon across four states.  And the system worked.  Most Celerity students came from low-income neighborhoods, yet the average Celerity student outperformed their peers in the L.A. United School District.[4]  For example, four of Celerity's seven California schools were named Distinguished Schools.  *See* "Celerity Educational Group's Track Record of Success," Ex. L to Brucker Dec.  Out of schools with similar demographics, the Celerity Schools had an average ranking by the Department of Education of 9.7 out of 10.  *Id.*  When ranked across all demographics, Celerity Schools had an average ranking of 8.3.  *Id.*  Across the entire Celerity Network, the Celerity Schools had an average Academic Performance Index of 886 out of a possible 1,000.  *Id.*

---

[4] For instance, Celerity Dyad and Celerity Troika in central Los Angeles, whose student bodies are respectively 81% and 99% black and Latino, have consistently outperformed neighborhood district schools even though 69% and 96% of their students were low income, and many others are English language learners.  *See* Szymanski, Mike, "Why did the feds raid Celerity charter, and what's next?". LA School Report (Jan. 26, 2017), *available at* http://laschoolreport.com/why-did-the-feds-raid-celerity-charter-and-whats-next/ (last accessed April 16, 2019).


LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4838-4405-8517.3
10
MS. MCFARLANE'S SENTENCING MEMORANDUM

1    Martha Patricia Cabingao, director of the Los Angeles YWCA and parent to
2    former Celerity students, explains in her letter to the Court the significance that
3    Celerity had in the lives of her family.  *See* Letter of  Martha Patricia Cabingao, Ex.
4    F to Brucker Dec.  She recounts how, in the past, LAUSD school officials and
5    counselors characterized entrance into a UC school as nothing more than a
6    pipedream for her children.  *See id.*  But after Ms. Cabingao enrolled her kids in a
7    Celerity school, they received "a top-notch performing arts program [her] children
8    did not have opportunity to experience in an LAUSD school."  *Id.*  Ms. Cabingao
9    explains that the Celerity Network has helped countless kids who otherwise would
10   be "condemned to a marginal education."  *Id.*

11   Even in her role as the founder and CEO of the Celerity Schools (and later of
12   Global), Ms. McFarlane never lost her commitment to her students.  Ricardo
13   Mierles, Executive Director of a Los Angeles charter school dedicated to serving
14   students from low-income neighborhoods, explains how Ms. McFarlane regularly
15   went out of her way to assist former Celerity students with securing financial aid
16   and excelling at their studies.  *See* Letter of Ricardo Mierles, Ex. J to Brucker Dec.
17   It was this tirelessness that earned Ms. McFarlane the high esteem of professionals
18   in the field of public education and social services.  *See* Letter of Nathan D. Arias,
19   President and CEO of Soledad Enrichment Action, Ex. I to Brucker Dec.

20   ## G.    From Celerity Schools To The Celerity Network

21   The Celerity Network first began with a handful of schools in the Los
22   Angeles area operated by CEG.  In her role as the CEO of CEG, Ms. McFarlane
23   noticed a sharp distinction between the way that the Googles of the world could
24   operate, and the way that CEG and its network of schools could function.  She
25   observed how the restrictions imposed on state and federal funds restricted the
26   growth of the Celerity model by prohibiting CEG from engaging in business and
27   investment, even though these opportunities were fully in line with its mission of
28   providing top-notch education to low-income families.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4838-4405-8517.3

11

1    So, Ms. McFarlane did what most reasonable people would do.  She sought

2  legal advice from the top charter school lawyers in California.  And they had a plan.

3  In 2012 they advised CEG to create Global, a non-profit that would serve as the

4  parent company to CEG.  The premise behind this undertaking, devised and planned

5  with the full oversight of counsel and with the express approval of CEG's Board,

6  was to create a structure that would free Global to expand the Celerity model and

7  engage in more traditional types of business transactions—e.g., own property, invest

8  in new ventures, create new businesses—that could help spread the Celerity model

9  to more students in desperate need of its services.

10    The idea was that the funds that were earned by Global from managing CEG

11  and the Celerity Schools would not carry the same restrictions that limited the use of

12  state and federal education funds that the Celerity Schools received.  Ms. McFarlane

13  and her counsel believed so strongly in the promise of this novel expansion model,

14  which was recently rendered unlawful due to changes in the Education Code, that

15  they presented it at various conferences and educational conventions.  And the novel

16  idea was carried out successfully.  Global went on to open Celerity Schools in Ohio,

17  Louisiana, and Florida.  Global founded Orion.  And Global created several for-

18  profit subsidiaries to engage in technology and other endeavors designed to serve

19  charter schools.  Although Ms. McFarlane was nominally named as the president

20  and/or shareholder of these entities, she never received any income other than from

21  her employer:  at first, CEG, and then Global.  All revenue generated by the

22  affiliated entities was provided to Global, which in turn used the funds to expand.

23    **H.    The Offense**

24    It was at this point that Global, with Ms. McFarlane at the helm, made a

25  number of foolhardy decisions.  In the hopes of expanding the Celerity Network,

26  Ms. McFarlane improperly caused CEG—at that time Global's subsidiary—to pay

27  for expenses that Global did not have the funds to pay for directly.

28  / / /

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4838-4405-8517.3

12

MS. MCFARLANE'S SENTENCING MEMORANDUM

The first was the purchase of a commercial property in Columbus, Ohio in 2013.  PSR ¶ 20.2.  This purchase occurred as a result of chartering authorities in Ohio asking Ms. McFarlane to open a new Celerity school in Ohio.  After examining several possible school sites, Global decided to acquire the property (through a limited liability company it owned).  The idea was that the Ohio property would both host a new school—Celerity Tenacia—and create commercial space that Global could lease out to private businesses, thereby generating income that could help support and expand the Celerity Network.  *Id.*

Unfortunately, Global's ability to finance the purchase ran into road blocks and, rather than miss out on the opportunity, it used approximately $3.1 million in CEG funds to purchase and renovate the Ohio property.  Although Global (through a limited liability holding company that it managed) booked the payments as loans and ultimately repaid the monies lent, *see* PSR ¶¶ 51, 59, Ms. McFarlane takes full responsibility for the crime of conspiring to cause CEG funds to be spent on the property's purchase and renovation without full disclosure to and approvals from CEG's Board and charter school authorizers.

The second venture involved Global's lease of a sound-stage and recording studio in Canoga Park, California in 2013.  PSR ¶ 20.3.  It was Global's intent that the Canoga Park property would serve both as a learning and event space for the Celerity Schools, as well as a commercial space that, again, could generate income to support and expand the Celerity Network.  *Id.*  The lease was executed during a transition period following Global's creation by CEG, wherein employees and expenses were being allocated between the two entities.  During this period, Global chose not to collect its full management fee from CEG and would, instead, have CEG would pay for certain expenses that should have been booked to Global.  This included paying for approximately 90% of the Canoga Park leasing costs for 2013 and 2014 (i.e., $158,000).  Shortly thereafter, Global and CEG finally reconciled their books and records and Global began paying for 100% of the Canoga Park

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4838-4405-8517.3

13

MS. MCFARLANE'S SENTENCING MEMORANDUM

leasing costs as it should have all along.  Unfortunately, the $158,000 figure was not properly reconciled (i.e., reallocated as a Global expense) and it forms the largest part of the jointly requested restitution amount.

Ms. McFarlane is the first to recognize that what Global did, at her direction, was wrong.  Though it was not her intent to deceive the CEG Board or the chartering school districts, and though it was her intent that the monies invested in these properties would lead to returns that could be reinvested in more schools, Ms. McFarlane understands that, in her zeal, she broke the law.  She should have recognized that, if Global did not have the funds to expand, CEG funds were not the solution (even if there was a full intent to repay them).

What Ms. McFarlane most regrets, though, are the personal expenditures (airplane tickets, hotel rooms, dinner reservations, designer leather goods) she made using both CEG and Global funds.  These expenses totaled approximately $67,000 over the course of five years.  *See* PSR ¶¶ 24-34, 58.  Unlike the Ohio and Canoga Park properties, these expenses were not made to advance or grow the Celerity Network.  And while, at the time, Ms. McFarlane rationalized the expenses as having business purposes, in truth, they were excessive and represented money taken directly out of the hands of Celerity students.  Though Ms. McFarlane has never lost her core values and dedication to the cause of education for all, she recognizes that during the five-year period, when her focus was directed at expansion at the 30,000-foot-level, she lost sight of what was happening on the ground, resulting in improper choices that were not in line with her principles.

## I.    Ms. McFarlane's Acceptance Of Responsibility

Ms. McFarlane was the founder and CEO of CEG.  She was the founder and CEO of Global.  She was the boss.  And when Ms. McFarlane gave direction, her direction was followed.  She was rightfully the target of the investigation because of her role and conduct.

/ / /

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    Ms. McFarlane has accepted full responsibility for her conduct.  She entered

2    into a plea agreement, waived her right to an indictment, and pled guilty within a

3    day of her first court appearance.  Dkt. Nos. 8, 11, 13.  She has waived her right to

4    appeal.  PSR ¶ 8.  Ms. McFarlane has also agreed to a restitution amount, which

5    totals a mere 7% of the total intended loss amount because of repayment of the

6    amounts borrowed from CEG for the Ohio property.  PSR ¶ 7.  And she has already

7    secured a home equity line of credit from the bank so that she can completely pay

8    off her restitution as soon as the Court enters a final restitution order.

9    Ms. McFarlane's efforts to make amends are not simply limited to her actions

10   in this case.  As she explains in her letter to the Court, Ms. McFarlane has done

11   everything in her power to right her wrongs and ensure that her failings do not affect

12   the Celerity Schools or their students and families.  *See* Letter of Ms. McFarlane,

13   Ex. A to Brucker Dec.

14   ## J.    Ms. McFarlane's Volunteer Work With Orion

15   Ms. McFarlane's primary motivation is redeeming herself in the eyes of her

16   community and former students.  To that end, for the last year and a half, she has

17   served as an unpaid volunteer with Orion which, like the Celerity Schools, is

18   dedicated to providing superb education to students from low-income backgrounds

19   and a free one for Celerity students.

20   Ms. McFarlane's volunteer efforts have put her back in touch with her roots.

21   On the ground level, she teaches classes to Orion students and coaches their sports

22   teams with her son Rolando.  And thanks to decades of experience in education, she

23   helps Orion's administration secure curriculum, recruit teachers, and provide

24   professional development.  As Orion's Executive Director explains, Ms. McFarlane

25   has donated "thousands of hours" of her time to Orion, driving 90 minutes every day

26   from her home to volunteer.  *See* Exs. B, D to Brucker Dec.  As she puts it,

27   "Vielka's role with Orion is absolutely critical to the success of the school and its

28   students."  *See* Ex. D to Brucker Dec.  Following her separation from CEG,

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4838-4405-8517.3
15
MS. MCFARLANE'S SENTENCING MEMORANDUM

1   Ms. McFarlane watched in horror as the Celerity Schools declined in quality and
2   enrollment numbers.  This, more than anything else, is her biggest regret.  She fears
3   that Orion will suffer a similar fate and could even close without her guidance.  The
4   Celerity students that she cherished have suffered as a result of her conduct.
5   Keeping Orion running for the benefit of its students is now her top priority.

6   **III.   THE COURT SHOULD IMPOSE NO MORE THAN A TWO-MONTH**
7   **CUSTODIAL SENTENCE, WITH NINE MONTHS OF HOME**
    **DETENTION**
8

9        Ms. McFarlane agrees with the Guidelines calculations presented by the U.S.
10  Probation Office.  However, she asks the Court to vary downward significantly
11  under the congressional mandate that "[t]he court shall impose a sentence sufficient,
12  but not greater than necessary" to satisfy the purposes of sentencing.  18 U.S.C.
13  § 3553(a).  For the following reasons, a sentence of two months in custody,
14  followed by three years of strict supervision, to include nine months of home
15  detention and 1,000 hours of community service, is sufficient, but not greater than
16  necessary to achieve the goals of sentencing under 18 U.S.C. § 3553(a).

17       **A.   Ms. McFarlane's History And Character Call For No More Than**
         **A Two-Month Custodial Sentence (18 U.S.C. § 3553(a)(1))**
18

19       Ms. McFarlane's history and character warrant a significant downward
20  variance.  *See* PSR ¶ 151 (citing to Ms. McFarlane's history and characteristics as a
21  potential reason for a downward variance).  Further, as a person with no prior
22  criminal convictions or even arrests, PSR ¶¶ 80-87, Ms. McFarlane's actions in this
23  case are utterly unrepresentative of the type of person she is.

24       As explained above, Ms. McFarlane comes from humble beginnings.  Thanks
25  to the sacrifices of her family, her own intellect and work ethic, and the influence of
26  some key figures in her early education, she managed to escape systemic poverty,
27  and become a successful educator, mentor, and administrator.  With only her wits

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  and passion for education, she went from factory worker, to college graduate, to

2  teacher, to administrator, to doctoral graduate.

3       Ms. McFarlane's wife, Winnie Tan,

4  describes Ms. McFarlane as the most "generous,

5  kind[,] [and] considerate" person that she

6  knows.  Ex. B to Brucker Dec.  Ms. Tan

7  recounts instances of random acts of kindness,

8  including when Ms. McFarlane pulled over to



9  help an elderly woman who appeared lost and disoriented and when she assisted the

10  bleeding victim of a hit-and-run until the ambulance arrived.  *Id.*  She explains that

11  Ms. McFarlane "was put on this earth with a greater purpose than most. . . . She has

12  an uncanny ability to uplift and inspire individuals and with them, entire

13  communities."  *Id.*

14       Despite Ms. McFarlane actions in this case—particularly the improper

15  personal expenses—she is a good person who made a series of grave missteps.  As

16  evidenced by the letters submitted by her wife, son, colleagues, friends, pastor, and

17  the students whose lives she has touched, *see* Exs. A-J to Brucker Dec.,

18  Ms. McFarlane is a generous and passionate advocate for educational access for the

19  marginalized and downtrodden of our society.  In light of Ms. McFarlane's history

20  and background, the Court should vary downward significantly and impose a

21  custodial sentence of no longer than two months.

22       **B.    A Significant Custodial Sentence Is Unnecessary To Reflect The
             Seriousness Of The Offense, Promote Respect For The Law, And
23           Provide Just Punishment For The Offense (§ 3553(a)(2))**

24

25       While accepting full responsibility for her actions, Ms. McFarlane asks the

26  Court to keep the following points in mind:

27       • The intended loss amount in this case (approximately $3.3 million in

28         total), resulting in a 16-level increase under U.S.S.G. § 2B1.1, comes

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4838-4405-8517.3
17
MS. MCFARLANE'S SENTENCING MEMORANDUM

from three categories of misuse of public funds, PSR ¶¶ 57, 66:

- o (1) $3.1 million (93% of the total loss amount) used to purchase the property in Ohio;

- o (2) $158,000 (5%) for the leasing costs of the property in Canoga Park; and

- o (3) $67,000 (2%) in personal expenditures.

- Although the $3.23 million (98%) used to pay for the properties in Ohio and Canoga Park constitute a misuse of public funds, the expenditures were still consistent with Celerity's purpose of providing excellent education to marginalized communities.  PSR ¶¶ 20.2, 20.3.

- The PSR reports that the monies used to purchase the Ohio property were paid back.  PSR ¶¶ 51, 59.

- Of the approximate $225,000 that has not been repaid, about $158,000 relate to the Canoga Park property, which was intended to benefit the Celerity Network.  PSR ¶ 58, 20.3.

- Ms. McFarlane's personal expenditures average $13,400 per year, which represents a small portion of her salary.  PSR ¶¶ 24-34, 58.

- If the loss amount were based solely on Ms. McFarlane's improper personal expenditures, she would receive only a six-level increase under the Guidelines rather than the 16-level increase she currently faces.  U.S.S.G. § 2B1.1(b)(1)(D).

Ms. McFarlane cites these statistics not to downplay the seriousness of her crime, but to point out a discrepancy between the high Guidelines range (37-to-46 months) and the seriousness of the offense.  Ninety eight percent of the intended loss amount, which is the driving factor in Ms. McFarlane's total offense level, comes from a misguided attempt to do something novel within the education field. Ms. McFarlane and her team, working within a structure sanctioned and devised by her education law counsel, tried to expand the Celerity Network to corners of the

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  country in desperate need of their services.  Ultimately, Ms. McFarlane fumbled the

2  ball in her execution of the plan; Global co-mingled funds, was sloppy with its

3  financial transactions, and failed to report its operations with full transparency.  But

4  the intent was not self-serving or devious.  The offense came out of a genuine desire

5  to better the lives of underserved students.

6      With that in mind, Ms. McFarlane respectfully requests that the Court vary

7  downward significantly.  Her request is not without precedent in the Charter School

8  universe.  The Court need look only to the recent sentence of Benford Chavis in the

9  Northern District of California.  *United States v. Benford Chavis*, N.D. Cal.

10  17cr0134-HSG.  Mr. Chavis was the Executive Director of the American Indian

11  Model School network in Oakland, California.  *See* Indictment, Dkt. No. 1,

12  17cr0134-HSG, ¶ 2.  In an alleged fraudulent scheme involving nearly $1.14 million

13  in federal funds, Mr. Chavis caused three schools in his charter school network to

14  enter into six-figure-per-year leases for three properties *that Mr. Chavis himself*

15  *owned*.  *Id.* at ¶¶ 7-22.  After nearly two years of litigation, he pled guilty to a

16  superseding information charging him with a *no loss* conspiracy.  *See* Dkt. Nos. 1,

17  68.  He was sentenced on April 22, 2019 to one year of probation.  *See* Dkt. No. 72.

18      With the exception of approximately $67,000 in personal expenditures

19  Ms. McFarlane committed an offense aimed primarily at helping students achieve

20  their full potential, despite conditions of poverty.  This stands in stark contrast to

21  Mr. Chavis' alleged scheme, which involved nearly $1.14 million in self-enriching

22  expenditures.  While Ms. McFarlane waived her right to an indictment and pled

23  guilty within a day of her first court appearance, Mr. Chavis forced the government

24  to go before the grand jury and litigated his case for nearly two years before

25  eventually pleading guilty.

26      In summary, the nature of Ms. McFarlane's crime—far less egregious than

27  the one that earned Mr. Chavis a one-year probationary sentence—warrants a

28  custodial sentence of no greater than two months.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1
2

### C.   A Two-Month Custodial Sentence Would Not Create An Unwarranted Sentencing Disparity (§ 3553(a)(6))

3   Exhibit K is an April 24, 2019 report by MCM Data Consulting.  The report

4   that analyzes statistical data compiled by the United States Sentencing Commission

5   and contains data on 99% of the 1.3 million criminal cases filed between 1999 and

6   2017.  MCM Data Consulting conducted an eleven step analysis to identify 14 cases

7   similar to the one at bar.  Each involves defendants like Ms. McFarlane who (1) pled

8   guilty to conspiracy, (2) fall in criminal history category I, (3) received a 16-level

9   increase under U.S.S.G. § 2B1.1(b)(1) due to the loss amount in the case,

10   (4) received a two-level upward adjustment under U.S.S.G. § 3B1.3 for abuse of

11   trust, and (5) received a three-level downward departure for acceptance of

12   responsibility.  Ex. K to Brucker Dec., at pp. 1-4.  The average sentence for these

13   defendants was 22.1 months, *id.* at p. 6, which represents ***an approximate 40%***

14   ***discount*** from the 37-month low-end of applicable Guidelines range.

15   As noted above, however, had the loss amount in this case been tied only to

16   Ms. McFarlane's personal expenses, the low-end of her range—after a six-level

17   increase for loss amount, a two-level upward adjustment for abuse of trust, and a

18   two-level downward adjustment for acceptance of responsibility—would be 10

19   months (total offense level 12).  Moreover, a whopping ***75 percent of conspiracy***

20   ***defendants who receive a six-level increase for loss and a two level-increase for***

21   ***abuse of trust receive a probationary sentence***.  *Id.* at 10.  Of those who receive a

22   custodial sentence, the average term of imprisonment is only 1.3 months.  *Id.*

23   Given Ms. McFarlane's background and lifelong commitment to educating

24   underserved populations, she is deserving of an equal, or even greater, reduction as

25   that received by other similarly situated defendants.  Her requested sentence of no

26   longer than two months of custody to be followed by nine months of home

27   confinement, therefore, would not create an unwarranted sentencing disparity.  To

28   the contrary, to impose a more severe sentence would actually create one.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4838-4405-8517.3

20

MS. MCFARLANE'S SENTENCING MEMORANDUM

**D.** **A Custodial Sentence Of More Than Two Months Is Unnecessary To Afford Adequate Deterrence To Criminal Conduct Or Protect The Public (§ 3553(a)(2))**

Ms. McFarlane, who has no prior criminal history, has already significantly paid for her role in the offense. Her reputation is ruined and she will never work in the charter school space in the future. The Celerity Network, her pride and brainchild, is struggling to stay afloat without Ms. McFarlane's leadership. *See* Ex. B to Brucker Dec. Moreover, Ms. McFarlane risks being taken away from her mentally challenged son, who already cannot sleep at the mere prospect of his mother's absence. *See* Ex. G to Brucker Dec.

Ms. McFarlane's most morally wrong act, her improper self-dealing, amounts to approximately $67,000 over the course of five years. If this same conduct took place within a private company, her improper personal expenses would most likely be treated as taxable income and she would face a civil fine rather than custody.

Ms. McFarlane has already faced significant collateral consequences as a result of her offense. A custodial sentence of more than two months is unnecessary to deter either her or others from committing offenses in the future.

## IV.   NON-CUSTODIAL SENTENCING RECOMMENDATIONS

### A.   Restitution

Ms. McFarlane agrees with the United States Probation Office that the Court should order $225,138.15 in restitution. PSR ¶ 146. As mentioned above, Ms. McFarlane has already taken steps to secure a home equity line of credit to timely meet this obligation.

### B.   Supervised Release

Ms. McFarlane respectfully requests a term of supervised release under conditions that restrict her movement within the community, yet permit her to continue her important work in education at Orion.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   To that end, Ms. McFarlane requests that the Court impose a condition that

2   she be confined to her home, under the standard restrictions, for a period of nine

3   months (the Orion 2019-2020 school year), with the added requirement that she

4   perform 1,000 hours of volunteer work at Orion (or a similar school).  As explained

5   by one Orion parent, "I am afraid that if [Ms. McFarlane] stops coming to Orion my

6   children's education and future will suffer.  I am asking that [the Court] allow her to

7   continue to volunteer for the future of my children and the children of so many other

8   families who cannot afford to pay for such a high-quality education."  *See* Ex. F to

9   Brucker Dec.

10   **C.**   **Self-Surrender Date**

11   Consistent with the plan discussed above, Ms. McFarlane respectfully

12   requests that she be allowed to self-surrender to her designated facility on July 1,

13   2019, so that she can finish the current school year at Orion and complete no more

14   than a two-month custodial sentence during the Orion summer break before

15   returning to Orion in the fall.

16   **D.**   **Fine**

17   Ms. McFarlane joins the United States Probation Office's recommendation

18   that no fine be imposed in this matter, *see* PSR ¶ 131, given the significant

19   restitution amount that Ms. McFarlane will be required to pay.

20   **E.**   **Bureau of Prisons Designation**

21   Ms. McFarlane respectfully requests that the Court list two BOP designation

22   recommendations on both the judgment and conviction and on the Court's statement

23   of reasons:  in order of preference, (1) Victorville FCI II – Minimum-Security

24   Satellite Camp; or (2) FCI Dublin – Minimum-Security Satellite Camp.

25   **V.**   **CONCLUSION**

26   Ms. McFarlane has a demonstrated history of advocacy for children who, like

27   herself, come from low-income neighborhoods.  In an attempt to help others and

28   create an educational system that improves the lives of people without resources,

**LEWIS**
**BRISBOIS**
**BISGAARD**
**& SMITH LLP**
ATTORNEYS AT LAW

4838-4405-8517.3

22

1  she started an organization that expanded too quickly and caused Ms. McFarlane to

2  lose sight of her roots.  But in the end, Ms. McFarlane has always been a passionate

3  force for educational access.  Her offense, while serious, is mitigated by her decades

4  of public service and the good intentions that sparked the Celerity Network of

5  schools.

6      For these reasons, Ms. McFarlane asks the Court to impose her requested

7  sentence.

8                            Respectfully submitted,

9  DATED: April 29, 2019          LEWIS BRISBOIS BISGAARD & SMITH LLP

10

11                        By:  */s/ Gary K. Brucker, Jr.*

12                             Gary K. Brucker, Jr.

13                             Attorneys for Ms. McFarlane